FILED'10 MAR 04 14:38USDC-ORP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

DARYL J. KOLLMAN, et al.,

                Defendants.

CV 08-3027-PA

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**PANNER, J.**

    The United States brings this action to reduce to judgment income tax assessments against defendants Daryl J. Kollman (Kollman) and Marta C. Carpenter (Carpenter).  The government claims Kollman and Carpenter jointly and severally owe more than $10 million in income taxes, penalties, and statutory additions for the tax years 1996 and 1997.

    After the court trial, these are my findings of fact and conclusions of law.  Fed. R. Civ. P. 52(a).  I order the government to recalculate its assessments based on my rulings, and to submit a proposed judgment within 30 days.  Defendants will then have 20 days to respond to the proposed judgment.

1 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT[1]

During the 1996 and 1997 tax years at issue here, Kollman and Carpenter were married and filing joint income tax returns. They were divorced in 2002. See In re Marriage of Kollman, 195 Or. App. 108, 111, 96 P.3d 884, 885 (2004). In this action, their legal interests are aligned, although they are directly opposed in other pending litigation. See, e.g., Kollman v. Cell Tech Int'l, Inc., Case No. 02-3774-CV (Klamath County Cir. Ct.) (appeal pending) (Kollman awarded $40 million judgment against Carpenter).

I credit Kollman's testimony, which often concerned subjects that were unpleasant for him to recall. I find that Carpenter, who represented herself, testified truthfully about facts relevant to the issues here. I make no findings on her testimony about subjects not at issue here.

The written report and the trial testimony of Kollman's expert witness, William Carlson, a certified public accountant with many years of experience, were very helpful to me. In preparing his expert report, Carlson reviewed all of defendants' tax returns and other financial records, including ledger entries for inventory and fixed assets, and working papers from the accountants who prepared the tax returns at issue. He also

---

[1] If any finding of fact should more properly be characterized as a conclusion of law, or any conclusion of law should more properly be deemed a finding of fact, it should be so construed. I address legal issues in this section, such as whether abandonment is an issue of fact.

interviewed defendants and others familiar with defendants'
business.  His explanations of the accounting and tax issues were
straightforward, reflecting his practical perspective.

The testimony of the government's expert witness, Professor
W. Eugene Seago, was not as helpful as Carlson's testimony.
While very well qualified to testify generally on accounting
issues, Professor Seago was much less familiar with the facts
than Carlson.

## I.  Cell Tech and Cell Tech International, Inc.

In 1982, Kollman founded a business that harvested,
processed, and sold blue-green algae as a nutritional supplement.
Kollman designed harvesting equipment and was the business's
inspirational leader, while Carpenter ran day-to-day operations.

In 1990, Kollman and Carpenter became the sole owners of the
business, using the trade name Cell Tech.  The business operated
through two subchapter S corporations, The New Earth Co. and The
New Algae Co., which were each half-owned by Kollman and
Carpenter.  For tax purposes, the corporations' income was
attributed to Kollman and Carpenter.  See Benson v. Comm'r, 560
F.3d 1133, 1134 (9th Cir. 2009).

In 1990, Cell Tech had sales of about $10 million.  From
1990 to 1996 Cell Tech grew rapidly through its network of
individual distributors selling directly to customers.  By 1996,
Cell Tech's gross receipts were more than $193,000,000.  Cell
Tech's products were sold across the United States and Canada
through 350,000 individual distributors.

Cell Tech then suffered what Kollman's attorney calls a
"perfect storm" of troubles:  "In 1997 Cell Tech found itself
with millions of dollars of worthless inventory, plummeting
sales, harvesting capabilities that far exceeded the new lower
demand, and state and federal tax liabilities that greatly
exceeded the [company's] dwindling income or cash reserves."
Kollman Post-Trial Br. 3.

In August 1999, as part of an attempt to save the business,
Cell Tech became a publicly traded corporation, Cell Tech
International, Inc.  See Kollman v. National Union Fire Ins.,
Civ. No. 04-3106-PA, 2007 WL 2344825, at *3 & n.2 (D. Or. Aug.
13, 2007) (describing the reverse merger through which Cell Tech
became Cell Tech International).  I refer to the pre-August 1999
business as Cell Tech and to its successor as Cell Tech
International.

After the reverse merger in August 1999, Kollman no longer
had a role in managing the business.  Carpenter became president
and CEO of Cell Tech International.

In October 1999, Cell Tech International entered into a
financing agreement with a private investor.  Defendants then
each owned more than 40% of the shares of Cell Tech
International.  As the company continued its downward spiral, by
late 2004 the terms of the financing agreement granted the
private investor ownership of more than 90% of the company.
Defendants' ownership share correspondingly dwindled to about 3%
each.

4  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

In 2002, Kollman brought a lawsuit in state court against
Carpenter, Cell Tech International, the private investor, and
other defendants.  After a jury trial, the state court issued a
judgment awarding Kollman $40 million in damages against
Carpenter and another defendant.  Kollman v. Cell Tech Int'l,
Inc., Case No. 02-3774-CV, Amended Limited Judgment (Klamath
County Cir. Ct. Nov. 8, 2004) (appeal pending).  The damages were
based on the jury's verdict that Carpenter breached a fiduciary
duty to Kollman by entering into the financing agreement that
diluted the value of Kollman's stock in Cell Tech International.

In 2005, Carpenter was replaced as CEO of Cell Tech
International.  The business now operates under the trade name
Simplexity Health.

## II.  Cell Tech's Inventory of Microcystin-Contaminated Algae

Cell Tech used screens to harvest the blue-green algae
*Aphanizomenon flos aquae* from irrigation canals fed by Klamath
Lake.  After Cell Tech had cleaned and frozen the algae, a third-
party contractor freeze-dried it, converting it to powder.  Cell
Tech used the powdered algae in its finished products, which were
mainly food supplements for human consumption.

In addition to the *Aphanizomenon flos aquae* algae, Klamath
Lake contains another species of blue-green algae, *Microcystis
aeruginosa*, which produces microcystin, a potent liver toxin.
Cell Tech tested frozen algae after harvest to prevent toxic
microcystin contamination in its products.

In 1996, the Oregon Department of Agriculture considered

5  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

restricting microcystin content to one part per million in
finished products for human consumption.  Cell Tech opposed the
regulation, citing its experts' opinion that a microcystin
content of five parts per million was safe for human consumption.
No other jurisdiction had imposed a similar restriction on
microcystin content.  Despite Cell Tech's objections, however,
the regulation took effect in October 1997.  Or. Admin. R. 603-
025-0190(2).

The microcystin regulation was an immediate public relations
disaster for Cell Tech.  Sales fell as customers worried that
Cell Tech's food supplements were unsafe.  In 1997, Cell Tech's
gross receipts were about $113 million, down more than $80
million from 1996.  In 1998, gross receipts were about $69
million; in 1999, $52 million; and in 2000, $37 million.

After the regulation took effect, Carpenter hoped that Cell
Tech would discover a novel use for the frozen contaminated
algae, or find a method to extract microcystins.  She testified,
"Given here that [the algae] was frozen, once you have it and you
throw it out and then you discover, oh, my goodness, you can make
biofuel out of it, it's gone."  Tr. 328.  Cell Tech never found a
use for the contaminated algae, however.

Although most of its products were food supplements, Cell
Tech did sell shampoo and soil amendments.  Because the shampoo
contained less than a gram of algae per unit, it would have used
only a tiny fraction of the contaminated algae.  Cell Tech also
considered using frozen contaminated algae as a soil amendment,

6  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

but in bulk form the algae was difficult to transport and even
more difficult to spread. Freeze-drying the algae for conversion
to powder would have been prohibitively expensive. Cell Tech
could not even give the contaminated algae away to local farmers.
One person who did accept a free sample of the algae discovered
that it thawed into a stinking, viscous mess, useless as a soil
amendment.

The government suggests that the contaminated algae had
value because Cell Tech could have used it in products sold
outside Oregon. Kollman testified, however, that he understood
the regulation applied to sales outside of Oregon: "It was under
the ruling of Oregon that we could not, for example, sell it to
California." Tr. 82. Even if Oregon would have allowed Cell
Tech to sell products violating its regulation out of state, such
sales would have further harmed Cell Tech's already battered
reputation. It would be difficult to generate enthusiasm for a
food supplement officially condemned as toxic by the State of
Oregon. Defendants were also justifiably concerned about
potential tort liability. Cf. Blake v. Cell Tech Int'l, Inc.,
228 Or. App. 388, 208 P.3d 992 (affirming exclusion of expert
testimony on whether microcystin in Cell Tech products caused the
plaintiff's death), review denied, 347 Or. 42, 217 P.3d 688
(2009).

Cell Tech's decision to store the tons of contaminated
frozen algae for several years does not prove that the algae had
any value. Kollman testified that Cell Tech had not determined

7  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

the safest and most economical way to dispose of the algae.
Burning would disperse particles into the air, while dumping it
back into the irrigation canals would carry it to farms
downstream.  On the other hand, the cost of continued storage was
minimal because of the available space in Cell Tech's freezer.
Kollman testified that the "freezer where all the product was
located was a single unit of about 50,000 square feet on the
floor . . . .  And so basically there was a cost of electricity
that was fairly much set by the need to keep the [non-
contaminated algae] stored and frozen."  Tr. 56-57.  Defendants'
expert witness, William Carlson, testified that "the additional
storage costs, which we accountants would call incremental costs,
[were] next to nothing."  Tr. 216.

I find as of October 1997, when the Oregon microcystin
regulation took effect, the contaminated algae in Cell Tech's
inventory was completely worthless.  There is no evidence that
any viable market existed for the frozen contaminated algae, even
as scrap.  None of the uses suggested by the government, such as
putting it in products sold out of state or using it as a soil
amendment, would have been practical.

Cell Tech mistakenly processed one batch of contaminated
algae and deducted the cost of that batch, $360,000, on its 1997
tax return.  Cell Tech did not take deductions for the remainder
of the contaminated algae.  Cell Tech International did not
dispose of the contaminated algae until about 2003, when it was
dumped on land owned by Carpenter.  Cell Tech International took

8  -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

deductions for the contaminated algae in its 2003, 2004, and 2005 income tax returns.

## III.  Abandoned Harvesting Equipment

Cell Tech could harvest only during the summer when blue-green algae bloomed.  To meet the increasing demand for Cell Tech's products, in 1996 defendants decided to build a state-of-the-art harvesting plant at one of the canal sites, at a cost of about $20 million.

The new harvesting facility required 900 gallons of fresh water per minute.  Cell Tech drilled a well nearby, but it produced under 50 gallons per minute and was abandoned.  A second well produced about 200 gallons per minute.  Cell Tech was forced to redesign the harvesting facility to incorporate a reserve water tank.  The second well is still in use, but only to supply water for an employee break room.

At a cost of $450,000, Cell Tech installed a reverse osmosis system in 1996 to extract water from harvested algae.  The osmosis system was intended to reduce the cost of transporting and processing algae.  On its first run, however, the osmosis system failed, ruined by water containing bentonite, a fine clay that had been used to seal the newly drilled well.  The system's vendor told defendants that the clogged membranes could not be repaired and that the entire osmosis system would have to be replaced.  As of fall 1998, Cell Tech concluded that the system was worthless, even as scrap, and abandoned it in place.

Doug Jackson, who has worked for many years at Cell Tech

managing construction and harvest, testified that specialized
wiring installed at the new facilities cost $1,500,000, mostly
for labor.  When the wiring was sold years later at auction, it
realized only scrap value.

After the microcystin regulation took effect in 1997,
defendants realized Cell Tech could no longer harvest from the
canal sites because the flow of water in the canals mixed the
non-toxic algae with microcystin algae.  On Klamath Lake itself,
Cell Tech's workers could avoid harvesting the microcystin algae
because it is a brighter green color than the *Aphanizomenon flos
aquae* algae.

In 1998, Cell Tech attempted to harvest algae from the canal
facilities, but could not avoid microcystin contamination.  By
the end of 1998, Cell Tech decided to stop harvesting from the
canal sites.  Kollman testified that the decision to abandon the
Cell Tech's state of the art harvesting facilities was
devastating to him, but he saw no alternative because of the
microcystin problem and the expense of operating the new
facility.

The custom harvesting screens had scrap value only.  The
price of steel was so low in 1998 that removing the screens would
have cost more than their scrap value.  The screens were left in
place.

Whether a taxpayer has sustained a loss because of abandoned
assets is an issue of fact.  A.J. Indus., Inc. v. United States,
503 F.2d 660, 667 (9th Cir. 1974).  The taxpayer must show both

10 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

an intent to abandon the asset and an affirmative act of abandonment. Id. at 670-71. "The subjective judgment of the taxpayer . . . whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer." Id. at 670 (citation omitted).

I find that defendants have shown that they intended to abandon all the harvesting equipment at the canal sites by end of 1998. They reasonably concluded that the drawbacks of harvesting from the canal sites outweighed the advantages. Defendants acted to abandon the sites.

I find that Carlson's figures on the value of the abandoned assets, adjusted for depreciation, are accurate. Carlson based his figures on the available business records and on his interviews with defendants and others.

I find defendants have not shown that they are entitled to an abandonment loss for the second well. That well is still in use, although not for its original purpose.

## IV.  **Excess Production Capacity Costs**

In 1998, Cell Tech had excess production capacity costs because its investments in new facilities, combined with the sharp drop in demand for its products, raised the cost per unit of its products. Cell Tech did not take an excess capacity deduction on the 1998 tax returns, although it recorded an inventory volume variance, which is just a different term for

11 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

excess capacity costs, of $5,135,951 on its books for 1998.  I credit the testimony of Carlson that this amount accurately reflects Cell Tech's excess capacity costs for 1998, given "the simple economic reality of a company that went from selling almost $200,000,000 of product in 1996, to selling $69,000,000 in 1998."  Kollman Post-Trial Br. 16.  Carlson's testimony was based on his familiarity with Cell Tech's financial records.

Carlson testified that in his professional opinion, Cell Tech's failure to deduct the excess capacity costs incurred in 1998 on its 1998 tax returns was a mistake.  In every other year from 1995 through 1999, Cell Tech deducted its excess capacity costs in the year they were incurred.  Similarly, from 1999 through 2005, Cell Tech International took deductions for excess capacity costs in the year the costs were incurred.  The excess capacity costs for 1998 were deducted in the 1999 through 2001 tax returns.

## CONCLUSIONS OF LAW

### I.  Burden of Proof

"'In an action to collect taxes, the government bears the initial burden of proof.'"  In re Olshan, 356 F.3d 1078, 1084 (9th Cir. 2004) (quoting Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997) (further citation omitted)).  Here, the government satisfied its initial burden through the IRS assessments, which "are presumed correct as 'long as they are supported by a minimal factual foundation.'"  Id. (quoting Palmer, 116 F.3d at 1312).  If the taxpayer rebuts the

presumption in favor of the government, "the burden reverts to
the IRS to show that its determination was correct." Olshan, 356
F.3d at 1084 (citing Keogh v. Comm'r, 713 F.2d 496, 501 (9th Cir.
1983)).

## II.  The Duty of Consistency Does Not Apply

The government contends that defendants' requested
deductions are barred by the duty of consistency, which applies
when there is

> (1) A representation or report by the taxpayer; (2) on
> which the Commission[er] has relied; and (3) an attempt
> by the taxpayer after the statute of limitations has
> run to change the previous representation or to
> recharacterize the situation in such a way as to harm
> the Commissioner.  If this test is met, the
> Commissioner may act as if the previous representation,
> on which he relied, continued to be true, even if it is
> not.  The taxpayer is estopped to assert the contrary.

Estate of Ashman v. Comm'r, 231 F.3d 541, 545 (9th Cir. 2000)
(quoting Herrington v. Comm'r, 854 F.2d 755, 757 (5th Cir. 1988)
(citation omitted)).

The government contends the duty of consistency applies
because the IRS relied on defendants' representations in their
1996 and 1997 returns when it assessed income taxes for those
years, and defendants now seek to amend their 1996 and 1997
returns after the statute of limitations has run for Cell Tech
International to delete the deductions on its returns.

I agree with Kollman that the duty of consistency does not
apply.  The duty of consistency is an equitable doctrine.  See
Estate of Ashman, 231 F.3d at 543.  When Cell Tech International

13 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

took the deductions after 1999, it was carrying such a large net operating loss (in the neighborhood of $20 million), that the deductions did not reduce its income tax liability.  If Cell Tech International had not taken the deductions, the only effect would have been to decrease its net operating loss.  It would not have owed any additional taxes during the relevant years.  Allowing defendants to amend their 1996 and 1997 tax returns to include these deductions will not harm the Commissioner financially.  I note that the taxpayer who initially took the deductions, Cell Tech International, is not the same as the taxpayers who now seek to take the deductions, Kollman and Carpenter.

The government argues that allowing the deductions will unfairly benefit defendants.  I disagree.  Defendants were entitled to take the deductions in the tax year in which the relevant events occurred.  Taxpayers are permitted to amend returns to correct errors.  The amended returns with the added deductions will better reflect Cell Tech's actual financial circumstances for 1996 through 1999.  Cell Tech International has agreed to amend its books to account for deductions that will now be taken by defendants.  Cell Tech International has also agreed to amend its prior tax returns if permitted to do so.

**III.  The Statute of Limitations Does Not Bar This Action**

Kollman contends that the ten-year statute of limitations, 26 U.S.C. § 6502(a), bars the government from levying on the assessment for the 1996 tax year.  Because it is undisputed that this action would be timely under the applicable Treasury

14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

regulation, Kollman must show that the regulation is invalid.

The statute of limitations was tolled when defendants requested a collection due process hearing.  Tolling continues for the "period during which [the collection due process] hearing, and any appeals therein, are pending." 26 U.S.C. § 6330(e).  The challenged regulation interpreting the statute, § 301.6330-1(g)(1)[2], provides that when the IRS issues a notice of determination after a collection due process hearing, tolling continues for the 30 days during which the taxpayer may seek judicial review of the IRS determination.  Under the regulation, tolling continues for thirty days even if, as here, the taxpayer does not seek judicial review.  Kollman argues that the regulation conflicts with the statute because the statute provides that the collection due process hearing is final on the

---

[2]   Treas. Reg. § 301.6330-1(g)(1) provides,

The periods of limitation under section 6502 . . . are suspended until the date the IRS receives the taxpayer's written withdrawal of the request for a CDP [Collection Due Process] hearing by Appeals or the determination resulting from the CDP hearing becomes final by expiration of the time for seeking judicial review or the exhaustion of any rights to appeals following judicial review.  In no event shall any of these periods of limitation expire before the 90th day after the date on which the IRS receives the taxpayer's written withdrawal of the request that Appeals conduct a CDP hearing or the Notice of Determination with respect to such hearing becomes final upon either the expiration of the time for seeking judicial review or upon exhaustion of any rights to appeals following judicial review.

15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

day the IRS issues its notice of determination if the taxpayer
does not appeal.

The statute provides,

if a [collection due process] hearing is requested . .
. , the levy actions which are the subject of the
requested hearing and the running of any period of
limitations under section 6502 (relating to collection
after assessment), section 6531 (relating to criminal
prosecutions), or section 6532 (relating to other
suits) shall be suspended for the period during which
such hearing, and appeals therein, are pending.  In no
event shall any such period expire before the 90th day
after the day on which there is a final determination
in such hearing.

26 U.S.C. § 6330(e).  I agree with the government that § 6330(e)
does not address when the IRS determination after a collection
due process hearing becomes final.  The Treasury regulation
reasonably resolves this ambiguity in the statute by defining the
day the determination becomes final as either the day on which
the time for taking an appeal has expired or the day the taxpayer
has exhausted rights to appeal.  Treas. Reg. § 301.6330-1(g)(1).
The regulation follows "familiar principles which have been
applied to statutes of limitations" in other contexts.  See
Burnett v. New York Cent. R. Co., 380 U.S. 424, 435 (1965) ("the
limitation provision is tolled until the state court order
dismissing the state action becomes final by the running of the
time during which an appeal may be taken or the entry of a final
judgment on appeal").  The regulation also prevents the IRS from
enforcing the levy during the thirty-day period for taking an
appeal.

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

When a regulation reasonably interprets an ambiguous statute, the court should give substantial deference to the agency's interpretation.  See Walthall v. United States, 131 F.3d 1289, 1297 (9th Cir. 1997); Redlark v. IRS, 141 F.3d 936, 939 (9th Cir. 1998) ("Only if the [statute] has a meaning that is clear, unambiguous, and in conflict with a regulation does a court have the authority to reject the Commissioner's reasoned interpretation and invalidate the regulation.").  I conclude that Treas. Reg. § 301.6330-1(g)(1) is valid and this action is timely as to the 1996 tax year.

## IV.  Deductions Sought by Defendants

### A.  Abandoned Assets

"There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."  26 U.S.C. § 165(a).  Courts have referred to losses under § 165 as abandonment losses because the taxpayer must act in a way that shows an intent to discard or discontinue use of the asset permanently.  A. J. Indus., 503 F.2d at 670.  When the taxpayer has not relinquished possession of an asset, there must be a concurrence of the act of abandonment and the intent to abandon, both of which must be shown from the surrounding circumstances.  Id. (citing Beus v. Comm'r, 261 F.2d 176, 180 (9th Cir. 1958)).

I conclude that defendants have shown both an intent to abandon the harvesting equipment, and affirmative acts of abandonment.  The testimony of defendants shows that they decided

17 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

by the end of 1998 to stop harvesting from the canal sites to
avoid microcystin.  Defendants acted on this decision by ending
their use of the canal sites and by attempting to sell the
screens and other equipment.  Abandoned assets need not be
worthless to qualify for the abandonment deduction.  See Echols
v. Comm'r, 950 F.2d 209, 211 (5th Cir. 1991) ("[w]orthlessness
and abandonment are separate and distinct concepts").

Defendants are entitled to deduct the depreciated basis of
Cell Tech's abandoned assets.  Because the osmosis system was
ruined on its first use, its basis was never depreciated by Cell
Tech.  Rounded to the nearest dollar, defendants are entitled to
deductions of $47,991 for four screens; $644,331 for new harvest
screens; $74,062 for debris screens; $287,111 for ten new harvest
screens; $450,000 for the osmosis system; $1,050,077 for
specialized electrical systems; and $61,013 for one of the wells.
Defendants are not entitled to deduct the depreciated basis of
the second well, $28,772, because they have not shown that it was
abandoned.

I conclude that defendants are entitled to deduct a total of
$2,614,585 in abandonment losses for the 1998 tax year.

**B.  Frozen Contaminated Algae in Inventory**

The government contends that Cell Tech's inventory of frozen
contaminated algae should not be treated as worthless in 1997 and
1998 tax years because Cell Tech was still hoping to find a
market for the algae.  I disagree.

In C-O-Two Fire Equipment Co. v. Commissioner, 219 F.2d 57

18 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

(3d Cir. 1955), the court addressed a similar issue:  "Is an
optimistic taxpayer subsequently prevented from claiming his loss
for an obsolete inventory as of the date when it, in fact, became
obsolete, because he tried to use the material bought for his
unsuccessful venture by readjusting his product so as to keep his
market alive?"  Id. at 58.  The taxpayer in C-O-Two decided to
manufacture and sell "Phonettes," which were telephone-like
devices that played music for a nickel.  In theory, Phonettes
would have been more profitable than jukeboxes because
restaurants or taverns could have multiple Phonettes in use
simultaneously.  In practice, however, it was obvious by the end
of 1946 that Phonettes had failed miserably in the market.
Instead of admitting defeat, the taxpayer attempted to salvage
its investment by creating a dozen prototypes of a new and
improved Phonette that accepted both nickels and dimes.  Not
surprisingly, the improved Phonettes did not excite any interest
and the taxpayer gave up on the product in 1947.

The Third Circuit agreed with the taxpayer that for tax
purposes the loss occurred in 1946, not 1947.  The court
reasoned, "It would be unfortunate if efforts made by a taxpayer
to use expensive inventory for something other than junk were to
be at his peril tax-wise.  It is an uneconomical thing to scrap
expensive material for junk if there is better use to be made
with it."  Id. at 59 (footnote omitted).

Although C-O-Two did not concern raw material, its reasoning
applies here.  Despite Carpenter's optimism that Cell Tech would

find a use for the contaminated algae, the algae had no value as
of the date of the microcystin regulation.

The government's expert, Professor Seago, relied on Thor
Power Tool v. Commissioner, 439 U.S. 522, 545 (1978), in arguing
that defendants should not be allowed a deduction for
contaminated algae in 1997 and 1998.  I agree with defendants
that Thor Power Tool does not apply here.  There, the taxpayer
attempted to claim a loss based on excess inventory.  The
inventory was not defective, just surplus, so it still had value.

The government argues that allowing defendants to take a
deduction for contaminated algae would require a change in Cell
Tech's accounting method from cost to the lesser of cost or
market value.  Under 26 U.S.C. § 446, a taxpayer generally must
obtain the Commissioner's consent before changing accounting
methods.  See Homes by Ayres v. Commissioner, 795 F.2d 832, 834
(9th Cir. 1986).

I conclude that the deduction complies with the applicable
regulation, Treas. Reg. § 1.471-2.  That regulation provides that
"raw materials or partly finished goods held for use or
consumption . . . shall be valued upon a reasonable basis, taking
into consideration the usability and the condition of the goods,
but in no case shall such value be less than the scrap value."
The regulation authorizes defendants to value the contaminated
algae at its scrap value, which is zero.

I conclude that defendants are entitled to a deduction of
$4,680,000 for 1997 (which accounts for the $360,000 deduction

20 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

taken in defendants' 1997 return), and a deduction of $1,500,000 for 1998.

## C.  Excess Capacity Costs

I conclude that defendants are entitled to a deduction of $5,135,951 for the excess capacity costs for 1998.  I have found that Cell Tech's failure to deduct excess capacity costs in the 1998 tax return was a mistake.  In every other year from 1995 through 2005, Cell Tech and Cell Tech International deducted excess capacity costs in the year they were incurred.

### CONCLUSION

The government is ordered to recalculate its assessments based on these rulings, and to submit a proposed judgment within 30 days.  Defendants will then have 20 days to respond to the proposed judgment.

IT IS SO ORDERED.

DATED this _____ day of March, 2010.

OWEN M. PANNER
U.S. DISTRICT JUDGE